All right, I got a lot of lawyers here, but do I only have one lawyer on each side that's going to be arguing? Okay, just want to make sure. Correct here to Judge Callahan. Judge Callahan, may I reserve four minutes for rebuttal, please? Well, as I say, it's always aspirational. I'm not great at math, as my fifth grader would tell you, but I figured four off 15 was close to three off 10. Well, if anyone studies me generally, if we take all your time, I usually give people a couple minutes for rebuttal, but if we don't take all your time, then we keep track of this. So it just, every case has its own life and its own journey, so go ahead. Agreed. May it please the Court, I'm Eamon Joyce for the Seagate Plaintiffs. Congress would not have imagined that a case like this would escape U.S. antitrust law, and the FTAIA doesn't compel anything differently. The nexus between this case and the United States is far stronger than in any of the other cases the parties have relied upon. So in our view, the real question is, one, whether to hold that NHK's U.S. conduct triggers the Sherman Act itself, or two, to decide the case under the FTAIA's domestic effects exception, because NHK's conspiracy tainted a bidding process in the U.S. and the resulting master product supply agreement and its amendments. Either way, the Seagate Plaintiffs' claim should proceed in full. And then, of course, those aren't our only paths to reversal. We've got these other two out there, the third being that Congress enacted multiple provisions to protect import trade and commerce, which here amounts to 33 percent of the components that Seagate purchased, and then finally there's at least fact questions around whether Seagate LLC acted as the direct purchaser, which I don't think is necessary to get to. We can use the district court's framing and reverse under this. This is a tricky case. It's not — it isn't — you're both going to tell me how it is easy, but it's not. And you're never going to — you're probably not going to convince the panel of this. But I'm wondering, in terms of if we were to adopt what you're proposing, how does this not open the floodgates for a new plaintiff's cottage industry? MR. CLEMENTI. Judge Kellyanne, I don't think you should have that concern at all, right? I think the reason why we believe reversal is proper here goes back to one of the first things I said. This U.S. nexus is incredible. You've got — and whether you take this under the Sherman Act itself or whether you take this under domestic effects, what we've got here is a foreign company coming to the United States, setting up an office in the United States to service my U.S.-based client, to negotiate through a sales director based in California, using a Minnesota office with my client, a contract governed by California domestic law. And that's where the — where the effects — JUDGE FONER. Well, I think the conspiracy, I might agree with you, the location might have been formed here. But some of the actions, you have the — that my understanding of the essays are it happens in your Singapore and your Thailand offices. They add that to make the HDD, right? MR. CLEMENTI. The assembly takes place, yes, over abroad, correct. JUDGE FONER. So it's a little bit — something happens over there and then comes here. MR. CLEMENTI. But I view it the other way around, Judge Kellyanne. When you go to the contract, something happens here that causes things over there, right? When you go to this PSA and its amendments, it is dripping with domestic, right? The moment that the California company enters that contract, there's no obligation of Seagate Thailand or Seagate Singapore to purchase. On the contrary, right, there's an allocation commitment in Section 2.4 of that contract, which you'd find at ER-892, that obligates Seagate LLC alone to purchase, a California company. And when you look at the contract and see who can purchase under it, that's at Section 2.7, ER-898, only affiliates that control are controlled by or are under common control with Seagate, again, meaning Seagate LLC. Everything runs through the California company. So — JUDGE LEE. How much is — for Seagate Thailand and Seagate Singapore, how much discretion do they have under these contracts and, you know, RFQs in terms of pricing? I mean, are they bound by specific prices, is there a certain band? MR. CLEMENTI. Zero is really the direct answer, Judge Lee, and it's up and down through the They have no discretion. The pricing terms in the product supply agreement apply regardless of whether Seagate LLC, the California entity, issues the PO or whether any foreign affiliate issues the PO. And it's one-to-one, right? I think that is what makes this case so different in some ways from these kind of arbitrage theories that the district court, right, cites this court's decision in DRAM. That's a case nothing like this. There, right, there is a market inflation that happens in the U.S. and then this very attenuated causation theory that that market inflation in the U.S. led to inflation abroad. And up and down the opinion, right, the — it's about correlating, and it's about figuring out whether there were intervening actors. Not so here. None of that is present here. The price is fixed in the PSA, and whoever makes the purchase pays that price, one-to-one without effects. And then I think — JUSTICE ALITO. Is it the PSA or the RFQ that sets the price? MR. CLEMENTI. So the PSA sets the price. The PSA — JUSTICE ALITO. Isn't it like a certain band of prices, or is it specific? MR. CLEMENTI. Well, there are bands that move based on volume. But there's no — there's no discretion in the process, right? And this isn't a record where, when the POs come in, my friends on the other side say, oh, but there's a different price going on here. Seagate and Thailand were getting something different than what Seagate LLC was promised. To the contrary, it's just one-to-one. And then I think that makes it also quite unlike Motorola, right? I would like to talk about the Seventh Circuit's opinion on Motorola because it seems to me it suggests that the harm from the conspiracy was incurred by Seagate Thailand and Seagate Singapore and not Seagate. So how was Seagate harmed in a matter distinct from the harm to Seagate Thailand and Seagate Singapore? MR. CLEMENTI. I actually don't think it's distinct, right? I think that's the Motorola problem. Motorola — so the district court decided this case under the assumption that Seagate Thailand and Singapore should be deemed the direct purchasers. We don't think that's right, but the harm is suffered by them and it relates directly to the PSA and it's approximately caused by the PSA. So it's not a problem. But if you want to make — and we think the record is very straightforward — to making Seagate LLC the direct purchaser, then the harm is also direct because Seagate LLC is essentially funding these purchases and paying the same rate in the PSA. Motorola is really different because of two — at least two things, I see, Your Honor. The first is you don't — Judge Posner deemed the foreign affiliates the direct purchaser. Again, take or leave that. I think we can win either way. But they weren't before the court. And then the second thing that's odd, right, is only the parent was before the court, but unlike here, it didn't have the theory. It didn't have the injury theory. I think it's really important to focus on what Motorola said and what the court said about Motorola. Quoting the Seventh Circuit, according to Motorola's damages expert, Motorola's foreign subsidiaries overpaid for the LCD panels. According to Motorola's damages expert, the company, meaning Motorola Domestic, raised the price of its cell phones in the U.S. more than the increased price. So there, right, Judge Posner was dealing with a huge theory of indirectness. In fact, he was dealing with a theory that's effectively a windfall theory. Motorola, the only party, the corporate parent before the court, had no injury by its own account. It had been made whole on pricing costs downstream. It's saying, give me — I've been made whole, but give me what my affiliates lost. That's not this case. Well, can you hear — since Seagate has not and cannot allege an indirect purchaser claim, is its antitrust claim barred by Illinois BRIC? No. I think — So apparently that — you did not get leave to amend, and that's been — that ship sailed a couple years ago by now, I think. That's right. And no — and that's not part of the certification. So I'm assuming that we're — that's just not in this case now? On the leave to amend or the direct purchaser. I'm sorry. I want to be clear. On the indirect. So the indirect, no, is not here, right? The direct purchaser side, the lower court did not certify on, we agree. But it's purely discretionary whether the court takes that issue up. I think if you think about 1292 and efficiency, there's good reason to take that question up, right? The nature of the denial of direct purchaser was on this notion that there was no genuine issue of material fact that these entities weren't acting as Seagate LLC's agents. Respectfully, Your Honor, you can't get there on this record, right? I referred you to the contract in the first instance that refers to those — it's essentially a control provision. Section 2.7 of the contract, affiliates that control are controlled by or under common control of Seagate are the only ones that can purchase. In the testimony up and down to Judge Lee's question earlier, not only were the prices static, but Thailand and Singapore had no ability on their own to do anything. They don't have customers. They are assembling products for Seagate LLC to sell, largely in the domestic marketplace. And the record is clear. We've cited these passages up and down in our brief. But I'll — If I can interrupt here.  And perhaps this is just the outcome of the district court saying Seagate LLC can't be an indirect purchaser here. But so what we're left here now is we have foreign companies, Seagate Singapore, Seagate Thailand. They're harmed outside the United States. They're seeking damages that will go to these foreign companies. Presumably, you've established these foreign affiliates so you can — you don't have to comply with American tax law, American labor laws, American environmental laws. They're all very onerous and costly. And so you take advantage of that, but then you want to come to American courts under American law to get vindicated. So it seems a little — and Judge Posner kind of hints at this in the Motorola of you can't have — you know, you take the good with the bad. You can't — that's a little bit odd here. And maybe just how this case has been, the procedural posture of it where Seagate LLC can't be. But given what we have, it does seem a little bit weird. Right. So I don't think it's as weird as you think. I mean, in the first instance of it is the procedural posture, right? Our position was Seagate LLC was the direct purchaser, that anything the foreign affiliates did, they were purchasing agents. You know, under BRIC itself, right, BRIC notes in — I think it's footnote 16 — that entities under the control of the parent, the BRIC principle doesn't apply to. We always saw Seagate LLC as the direct purchaser. But I think even if you're considering Seagate in Thailand and Singapore as the direct purchaser, it doesn't have really the concern that animated Judge Posner. When you look at the BRIC factors, right, there's no risk of duplicative damages. You've got everybody here. Every plaintiff is before the court. There's not this notion that you're going to bite here and bite there. That's one thing. The second thing, I think, is unlike in some of those other cases, the PSA does do a lot of work for you here in that the price is static. But I understand where Your Honor is coming from. But if Your Honor has concern about that, I think then perhaps the most straightforward path is either to say that LLC is the direct purchaser or at least to remand on that issue. Because as I said before, there's just no way you can get to summary judgment on these foreign affiliates not being the purchasing agent. I see I'm deep into my rebuttal time. Right. And depending on how much time we take with the other side, I may give you a little more rebuttal. But probably good to sit down unless my colleagues want to ask you something right now. Okay. Thank you. Good morning, Your Honor. And may it please the Court. Michael Murray for the defendants appellees. The plaintiffs in this case want to recover transactions that are the epitome of the FTAIA's choice of foreign law over American law. The goods were made abroad. The goods were shipped abroad. The goods were delivered abroad. The goods were remanufactured and sold again abroad at least twice at arm's length. And the money went from one foreign company to another. Well, why doesn't, why isn't it the fact that NHK knew that something like 99 percent of the hard disk drives that incorporated the SASs were bound for the U.S., sufficient to come within the, I'm sure you pronounce it otherwise, but the FTAIA's domestic effects exception? So for the domestic, Your Honor's question is relevant both to the import and the domestic effects, but I'll start with the domestic effects exception. So the problem with that, with the theory of the other side on the domestic effects exception, is one of timing. And it's one that both Motorola in the Seventh Circuit and the Second Circuit also rejected. And that problem is that the domestic effect in this case is an effect on U.S. prices. But what they alleged in their complaint on SCR 306, Supplemental Record, Expert Record 306, and also what all the other courts in this space have concluded is the right way to proceed, the domestic effect is the effect on prices of U.S. consumers. But they bought the suspension assemblies before that happened. And so the domestic effect can't give rise to something that happened before it. And so there's a chronological problem, regardless of whether it was foreseeable that some of the suspension assemblies would end up in the United States. And so that's what both the Seventh Circuit and Judge Posner's opinion in Motorola and also the Second Circuit have concluded, that there has to be a chronological connection. And that connection, that chronological issue, flows directly from the proximate cause requirement that this Court established in DRAM. Yes, but their argument is, and maybe it wasn't really articulated at the District Court clearly, but it's the PSA, that the PSA was negotiated in the United States and that increased prices in the United States, but it also increased prices outside the United States because PSA controlled not only prices in the United States, but also outside the United States. And that just said it because apparently the foreign affiliates had to follow that. So wouldn't that give rise to their harm? There's three problems with that argument, Your Honor, two legal and one factual. The first problem is that the PSA is an aspect of conduct, not an aspect of effect. The courts have been clear on that in Xiong, in DRAM, in EPRGRAM itself, that the effect, as pled in this case in their amended complaint, is on U.S. domestic prices. The second problem with that argument is that the text of the statute actually doesn't use the phrase domestic effect. What it actually says is there has to be an effect on trader commerce which is not trader commerce with foreign nations. Whatever the PSA did, and that goes to the factual argument I'm about to make, whatever the PSA did, it related to the foreign transactions, which clearly are transactions with foreign nations, not, as the statute requires, trader commerce that is not trader commerce with foreign nations. So it can't be an effect for that legal reason. But as a factual matter, I think it is important, and I think this is responsive to what my friend on the other side said, to talk about what the PSA is and what it is not. It did not effectuate any sales. Purchase orders were required to do that. Pricing and volumes were negotiated quarterly. One way to think about why this is obviously the case is that the PSA did not go into effect until five years after the alleged conspiracy started. So the conspiracy started in 2003, according to their complaint. The PSA was signed in 2008. So it can't be the case that the PSA, whatever it is, is the requisite effect in this case, just as a factual matter, because it did not effectuate any sales. Those sales occurred both after — excuse me, before the PSA started and after the PSA expired. If Seagate Thailand and Singapore were just buying the SAs and then shipping the SAs to Seagate here, if there wasn't an assembly issue, would that be a different case? I think Your Honor's question relates to the import exclusion, and I don't think it would be a different case with respect to the import issue, because the circuits are unanimous that it has to be the defendant's conduct that includes or is directed at imports. And in that — in Your Honor's hypothetical, that would be the plaintiff's conduct that involved the importation. But the plaintiff — Singapore and Thailand buy the SAs, and then they put them and make the HDDs, and then the HDDs are what come to the United States, right? Is there any significance to the fact that they're buying — and that — and apparently it's somewhat undisputed that your client got nailed in the United States for price-fixing and paid a hefty fine and didn't have to pay restitution because they talked about, well, people are going to be able to sue them, and then that's how that will come about. So is there any significance to the fact of this assembly of the price-fix part? There is for the import exclusion because it shows that it's the plaintiff's conduct that broke the chain, if you will, of importation there. But I do want to address Your Honor's question about the plea agreement and who can recover, because there are people who may be able to recover here. In fact, the district court rejected my friend's argument for that very reason. There's a case pending in Japan right now over these types of issues. There are indirect purchasers, including some large indirect purchasers, who have cases pending right now. The question is really — Indirect purchasers standing, that is not in the — that went away a couple of years ago, right, in this case. But I'm asking, is the indirect purchaser standing something that might be that they could state that they would have some — that there might be something they could sue you for? They've tried to amend their complaint to state — Well, they got without leave to amend. It's without leave to amend at this point, right? That's right, Your Honor, and that's because they resisted any of the — resisted discovery over indirect purchaser issues for years and then tried to amend afterwards, and the district court was understandably frustrated with that course of action, and so she denied them leave to amend. And that indirect standing — indirect purchaser standing was not certified as part of this, right? I believe that's correct, Your Honor. With respect to the agency question, that was not certified by the district court in her opinion, certifying the issue.  And we — on that particular issue, we have two particular responses. The first is we don't think that Your Honor should address the issue because it is a fact issue. The standards are agreed upon by the parties. But also, more importantly, it was actually rejected as irrelevant in Motorola, and so Motorola actually considered the very issue that they were trying to raise as an agency or indirect purchaser issue that Your Honor is alluding when Motorola considered the claim in that case, and Motorola concluded that it was irrelevant to the particular issue of the FTA's applicability. So Motorola isn't obviously binding on us. We don't have Ninth Circuit precedent, but obviously, if we were to — if we were to accept what the — what the appellants are offering here, that — that view of the case, it would create a split in the circuits, correct? Yes, Your Honor, certainly. Depending on which particular argument Your Honors accept, there would be a circuit split on either — anyone, any of their four arguments. Ruling for them would create a circuit split. If Motorola were binding, is — would it control the facts? If it were Ninth Circuit precedent, would that be the end of the inquiry from your perspective? Because I believe your friend on the other side said Motorola didn't address what we're addressing here. Yes, I think Motorola has addressed all of the arguments that they consider or advance and has actually rejected all of them. So with respect to the FTA's applicability, Motorola, of course, applied the FTAIA to a fact pattern very similar here. With respect to the — the import exclusion, Motorola held that the import exclusion did not apply when the plaintiff, rather than the defendant, did the importing. With respect to the effects exception, Motorola is directly on point with respect to the gives rise to issue that we're arguing in the chronological issue. The only other case that's close to Motorola in that regard is LOTUS from — LOTUS, excuse me, from the Second Circuit, which reached the same conclusion. And then on the agency issue, as I was just describing, Motorola rejected the idea that their agency argument is even relevant at all. And so on each of those issues, Your Honors, we need to create a circuit split with the Seventh Circuit's opinion and other courts, depending on the issue, to rule for them on their side. I'm sorry, Judge Lee. Yeah, if we can go back to domestic effects exception. And you had mentioned that PSA isn't really a domestic effect. It's conduct. And that's kind of a very tricky question. I understand it could be, in one way, viewed as conduct. It's maybe just a conspiracy, you know, bid rigging. On the other hand, PSA is kind of a weird vehicle. It's not just agreement to set prices. It's — it had this effect of setting prices globally. I mean, I know you dispute that, but assuming, you know, your friend's other side is correct, that this PSA basically creates this, you know, prices that's applicable in the United States elsewhere. So maybe it could be viewed as an effect. It's a little bit odd fact pattern, the PSA, assuming the other side, you know, you're crediting their version of it. I mean, are there any cases that discuss something similar to this that's kind of a weird fact pattern of something like a PSA that may have not just agreement on setting prices, but it kind of controls, it kind of radiates further from that? I think the answer to that, Your Honor, is yes. Many cases actually involve domestic negotiating or other types of conduct. Epigram itself did, actually. The Court there on 165 to 166 of its opinion noted that there was price-fixing conduct in the United States. The same was true in Chung and Motorola as well. So I think it's actually quite common to have some aspect of the price-fixing conduct in the particular — you can't maintain it elsewhere. This one is almost, you know, written in a contract, at least according to them, that sets — it's not kind of indirect. It's kind of — you know, that's one of the tough ones is, I don't know, do you consider it a conduct or an effect? You know, it's a tricky question. Yeah, I think the way to think about it with respect to the PSA is it's the type of conduct that the FTAIA was exactly trying to limit with respect to the liability for. That's the whole purpose of the FTAIA. And the cases are unanimous that when there's a global price-fixing conspiracy, some of what happens in the United States may have some sort of a relationship. But what DRAM tries to do in the — with the proximate causation test is distinguish between the, quote, unquote, result of the overall price-fixing conspiracy, that's DRAM's language, and the — and the effect, the relationship between the domestic prices and the — and the foreign prices. And so I don't think the PSA really gets them there in this case if one looks at the DRAM opinion and thinks through how it would fit in terms of proximate causation. Whatever the PSA — whatever the PSA did — and, you know, they're arguing one set of the facts, and we obviously think that if one looks at 890 to 898 and considers the facts the way the district court judged it, that that's not right. But whatever the PSA did, it had to do with foreign transactions that happened abroad with Thailand and a Japanese manufacturer. And that's the type of conduct that the FTAIA was actually trying, explicitly, to take out of the reach of the Sherman Act and have it proceed into foreign court, as is, in fact, the case in this particular — in this particular matter. There's only — there's one other point that I — that I wanted to make, with time permitting, with respect to the import exclusion, Your Honor, which is that if the import exclusion is read the way that they are reading it, it will create superfluity between the different provisions. And I think that's a key to turn back to the actual text of the statute here. In their particular reading of the statute, the word involves means multiple things, depending on which argument they're making. With respect to the FTAIA applicability issue, whether the FTAIA is triggered at all, the question they interpreted as meaning — involved means something like exclusively constitutes. But then when they turn to the import exclusion, involved now suddenly transforms and means it affects imports. And then in the domestic effect part, involves means something completely different as well, and it actually arguably means something that's confusing and inconsistent. And so I think one of the things that's important in this case is to try to keep the arguments separate and look at the actual text of the statute, which, though drafted many years ago, is particularly informative on this case. In conclusion, Your Honor, if there are no more questions, I'd just wrap up by saying that the position for my colleagues on the other side would lead to overwhelming liability because their argument about the PSA eliminates the temporal limitation or the proximate cause limitation. And there's a slippery slope from that argument, as I think Judge Callahan's perhaps first question indicated. There would be no limitation for foreign purchasers to recover for purchases that were made abroad as long as some aspect of the price-fixing negotiation happened within the United States. And that's the exact result that Congress was trying to avoid, and that epigram explained in its lengthy opinion regarding the purpose of the PSA. That's the type of problem that the FTIA was designed to prevent, and there's no limitation on the other side with respect to how that would be limited. What they tried to propose at the podium and briefly in their reply brief is that maybe there's some sort of nexus test. Well, there's some conduct here, there's some conduct there. I don't think that's consistent with the statute, which uses the word involved. But regardless of whether it's consistent with the statute, one can see how a nexus test evaluating how much conduct is in the U.S., how much conduct is abroad is entirely unmanageable and is what the FTIA was trying to avoid in limiting liability and sending those cases to foreign courts under foreign law. I see that my time has expired. Thank you, Your Honor. Let me see. Do either of my colleagues have any additional questions? No, thank you. All right. Thank you for your argument. Thank you. Maybe ambitious, but I want to work backward and then ultimately get to the questions you first posed to my friend on the other side, Judge Callahan. I want to start with Motorola and the notion that there'd need to be a split. I think that's just wrong, right? On ER-16, the lower court adopted the view that stated in Motorola, because it didn't have a foreign customer before it, that foreign customers couldn't recover under the statute. My friends on the other side disavow that on page 46 of their brief with good reason. Then that just leaves you with the proximate causation issue, which I think we've gone over, but I — which is to say the proximate causation here with the PSA and with all the entities before you is just completely different than the one that the Epigram, which my friend on the other side suggested something here we're doing is in tension with Epigram, because there there were some domestic effects argued. But I think you've got to go to the question presented in Epigram and what the Court said about it. The question presented stated that plaintiff was trying to pursue a theory premised on transactions occurring entirely outside U.S. commerce, and that gets bound up with this arbitrage theory that was pursuing. And many of these cases that my friends on the other side are relying on, DRAM among them, are just these arbitrage theories where the connections are not direct. It's not surprising that the Court didn't find proximate causation in those cases. Here, the connection is much more direct, and proximate causation is typically a fact issue. Doing this on proximate cause grounds just seems extraordinary to me. And then I think that takes us to the PSA and wraps back around both to Judge Callahan's questions and my friend on the other side's initial responses and some of the follow-up with you, Judge Lee. I just don't think you can look at the PSA as an element of conduct, right? As we say, I think in the reply brief, that makes Seagate a party to the conspiracy. And then I think you have to look at the effect on Seagate, right? Regardless of when a purchase order is placed, as soon as the PSA takes effect, Seagate's got obligations. It has to make purchases, or it's in breach. It has to spend costs on tooling. That runs all throughout the contract. And those effects are domestic. They're felt by Seagate immediately. And how do you deal with the situation between the conspiracy starting in 2003 and the PSA becoming in effect in 2008? So I think, Your Honor, it might be a damages issue down the road, but it's not a liability issue, right? The core theory before the court is that the PSA imposed anti-competitive effects. It suppressed supply, it reduced innovation, and it caused higher prices. Now, I think we can prevail on all of those. If there's some question about proximate causation pre-PSA, I just think that's a different question, not really before the court. I think the — Let me — you're over your time. Sure. So let me see if any of my colleagues have additional questions. I feel bad. I wanted to respond to Your Honor's last question about would the situation be different if Thailand and Singapore were just shippers? I'm happy not to, if Your Honor would prefer not to. Take a minute and bring it home. Sure. So I don't think it would present a different situation. I think the same problem exists regardless of what Thailand and Singapore are doing, at least for purposes of the import exclusion. It's clear that a defendant doesn't need to be an importer. And when you look at both what this case said in Xiong in finding that exception met, and what the Third Circuit said in Animal Science in finding — excuse me, exclusion, not exception met, was whether the conduct targets import goods. There is no question here that defendants' conduct targeted import goods. As Your Honor noted at the outset, they know these drives are coming to the states. They know these components of the drives are used only in these drives which are coming to the states. So irrespective of what Thailand and Singapore are doing, the targeting exists. And you can see the targeting in the contract itself, too. There are multiple provisions. You'll find them on ER-893, import and export formalities, and otherwise. Okay. Your mother probably said you don't know what a minute is, right? That to give them an inch, they take a mile. Yes. I'm sorry, Your Honor. But those are good lawyers. I don't fault anyone. I did that myself. So thank you both for your argument today. And this matter will stand submitted. This court is in recess. All rise. This court for this session stands adjourned. Thank you.
judges: CALLAHAN, LEE, UNKNOWN